E436JVCC

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   LORA,

4               Plaintiff,

5          v.                              11 CV 9010(LLS)

6   J.V. CAR WASH,

7               Defendant.

8   ------------------------------x
                                          New York, N.Y.
9                                         April 3, 2014
                                          3:15 p.m.

10  Before:

11                  HON. LOUIS L. STANTON,

12                                        District Judge

13                      APPEARANCES

14  ARENSON, DITTMAR & KARBAN
         Attorneys for Plaintiffs
15  BY:  LAURA E. LONGOBARDI
         STEVEN ARENSON
16

17
    LOUIS J. MAIONE, P.C.
18       Attorneys for Defendant
    BY:  LOUIS J. MAIONE
19

20

21

22

23

24

25

E436JVCC

```
 1                    (Case called; in open court)
 2                    THE COURT:  Good afternoon.
 3                    MS. LONGOBARDI:  Well, here we are again, Judge.
 4                    THE COURT:  Always a pleasure.
 5                    MS. LONGOBARDI:  It is always a pleasure, Judge.  As
 6      Mr. Arenson said to me a little while ago, We really have to
 7      stop meeting like this."
 8                    I've laid out in my April 1st letter --
 9                    THE COURT:  First thing is first.
10                    Mr. Maione, when do you think you will get any news
11      from the bankruptcy court about getting paid?
12                    MR. MAIONE:  On the 14th, your Honor.
13                    THE COURT:  Of?
14                    MR. MAIONE:  April.
15                    THE COURT:  Not too bad.
16                    MR. MAIONE:  No.
17                    THE COURT:  You can tread water until then.
18                    MR. MAIONE:  Judge, I am sure my letters have been
19      clear enough, but my biggest issue is not necessarily
20      representing them and not getting paid because eventually I am
21      going to get paid.  Eventually that will happen because out of
22      the bankruptcy we'll have to be paid whether he is liquidated
23      or not and I think he is going to --
24                    THE COURT:  There are no other claimants?
25                    MR. MAIONE:  There are really no other claimants other
```

1     than the 18 creditors.  My understanding is that he may be

2     putting in a plan soon.  That did not come from him, but all of

3     of the bankruptcy attorneys and myself speak all the time.  I

4     don't like giving away my services on a long lease, but

5     eventually I am going to get paid.  I am not in a position to

6     advance fees on his behalf and that is one of the aspects of

7     this.

8          The second part I think is the more important part is:

9     Is he capable really of participating at this point or does he

10    need some time to convalesce?  As I told Mr. Arenson earlier, I

11    heard from him today for the first time in 10 days and it was a

12    rather disjointed e-mail.  Usually he communicates fairly well.

13    The e-mail did not make much sense to me.  I haven't spoken to

14    him in, as I said, probably close to 10 days.  Though, I have

15    reached out for him a number of times.  I actually spoke to his

16    girlfriend yesterday because I called at his home late in the

17    afternoon and he was not around.  So I don't know how ill he is

18    and that is why my suggestion was let him be examined by his

19    doctor and figure out how bad this guy off is.

20          THE COURT:  That is what we're here to discuss.  The

21    only thought that occurred to me was as usual simple and

22    obvious so probably not terribly useful, but really since very

23    early in these pretrial exercises we've been having the

24    understanding has been clear that the trial turns on one issue

25    and it makes the structure of the arguments a little bit

4

E436JVCC

1   unusual.  That is, the defendant denies ever hiring these

2   people.  Well, the consequences of taking that position are

3   that it logically follows they never paid them anything.  So

4   the calculation of damages is simply whatever they can prove to

5   get.  There is nothing to offset.  Nothing complicated about it

6   except for the actual calculation.

7           If the trier of fact determines that they did hire

8   some or all and if the trier of fact decides in favor of the

9   defendant, the case is over.  They weren't hired.  So it is an

10  issue which is certainly finite.  Whatever documents and

11  testimony are focused on that issue in the nature are going to

12  be pretty short and manageable and it isn't a particularly

13  emotionally loaded question in the normal life.

14          So it is a relatively simple case to try, although not

15  terribly demanding of the witnesses and we shouldn't let all of

16  these pretrial gyrations let us forget that at the end of the

17  road it is fairly something simple.

18          MR. MAIONE:  I think that is true, your Honor.  The

19  plaintiffs all have testified conversely that he has paid them

20  and he paid them every day and he paid them cash and so forth.

21          THE COURT:  At least some of them.

22          MR. MAIONE:  No.  No.  Every one of them testified

23  that they worked at the car wash and they were paid.  The

24  contention as I understand it --

25          THE COURT:  But you know what is in the depositions.

E436JVCC

1    I don't.

2              MR. MAIONE:  My adversary can correct me if I am

3    wrong.  Most of them have said they got paid.  I think the

4    issue is I worked seven days a week, not six days a week like

5    the contention may be and I didn't get paid overtime and I

6    didn't paid the right amount of money, etc.  So that is kind of

7    the issue.  I think it has already been admitted by all of the

8    plaintiffs that he did pay them.

9              THE COURT:  By all the plaintiffs?

10             MR. MAIONE:  Yes.  His contention initially from what

11   I understand, what I was representing is that none of three

12   guys worked for him.  I understand that.  The only offset --

13   not the only offset, but I should say the mitigating issues are

14   whether these fellows worked all the days they said they

15   worked.  I think there is a lot of issues about the weather and

16   how it affects the car washes, etc., and we were prepared to

17   put on an expert forensic weather guy who would testify

18   generally speaking to what the weather is and how many days of

19   rain in New York and snow, etc.

20             So that our contention would be obviously that they

21   couldn't have worked seven days a week as they have under their

22   schematic in the month of December of 2011, for example,

23   because it snowed seven times.  There is that and there is the

24   fact that some of them, in fact, most of them testified to

25   having taken off a month here or a month there and so forth

6

E436JVCC

```
1    where they went back to the Dominican Republic or Honduras or
2    Mexico or wherever the case may be.
3            So generally speaking, yes, those are the issues
4    really in a nutshell.
5            THE COURT:  They don't all require Mr. Vasquez's
6    input?
7            MR. MAIONE:  I don't know about that because they all
8    contend that on a rainy day they stayed in the car wash and
9    washed the walls down and his contention is that he instructs
10   his managers to send people home and not to hang around when it
11   is raining.  The managers ostensibly will testify the same way.
12           THE COURT:  His position was that they weren't there
13   in the first place.
14           MR. MAIONE:  That they weren't there in the first
15   place.  Yes, I know that, your Honor.
16           MS. LONGOBARDI:  On one hand, your Honor, it sounds
17   like the defendants are conceding there is liability and that
18   the only thing that needs to be tried is damages.  Which if
19   that is where we are, I am happily do a case -- I will do a
20   trial on the quantum of damages if there is a concession of
21   liability.
22           THE COURT:  A magistrate judge can hold an inquest.
23           MS. LONGOBARDI:  We can do that, too.  I am not
24   entirely sure that that is what Mr. Maione is conceding.  I am
25   sure he will probably dispute there is a concession of
```

E436JVCC

1     liability.

2                THE COURT:  Textually it is not.

3                MS. LONGOBARDI:  And we have our own arguments about

4     what their testimony is going to be about when they worked and

5     how many days they worked and, yes, they did in fact work when

6     the weather was bad so that a forensic weather expert is not

7     going to add anything.  We can stipulate if you want to the

8     days that it rained; but the disagreement is, Well, just

9     because it rained, doesn't mean that they weren't there

10    working.  It may have rained an hour at 10:00 in the morning.

11    If it rained an hour at 10:00 in the morning, that doesn't mean

12    the car wash was closed the rest of the day.

13               THE COURT:  Do people wash their cars on rainy days as

14    much as on sunny days?

15               MS. LONGOBARDI:  They don't wash them while it is

16    raining, but especially in times snowy weather when you have

17    got salt and other stuff on the cars, you want to get that off

18    as quickly as possible.  So once the bad weather stopped, then

19    they are at car washes, particularly the black car drivers.

20               From what we understand from our clients, the car

21    wash, J V Car Wash on Broadway, which is a large car wash

22    facility, does considerable business with the black car drivers

23    who come in twice a day because of the clientele that they

24    serve that doesn't want to see their black car pull up to

25    Skadden Arps to get the Skadden Arps clients and attorneys show

E436JVCC

1    up in a filthy car.

2              THE COURT:  When you say "black," you are talking

3    about a taxi?

4              MS. LONGOBARDI:  No.  The limousine services.  That is

5    what I am talking about.

6              MR. ARENSON:  We understand that perhaps the busiest

7    time of all at the car wash is right after rain or snow.  So if

8    you have rain from 7:00 a.m. to 11:00 a.m., noon is very busy.

9              THE COURT:  I see.

10             MR. ARENSON:  So rain on a given day does not mean

11   that there were no workers there.  There has been extensive

12   testimony that the car wash had to be cleaned every day.  In

13   fact, Mr. Vasquez has emphasized that in his testimony and that

14   when workers were not -- when it was raining, there was plenty

15   of work to be done at the car washes that did not involve

16   servicing customers.

17             THE COURT:  Cleaning?

18             MR. ARENSON:  Cleaning the car wash.  That's right.

19   Handling the machines.  There were deep trenches that needed to

20   be cleaned where the dirty water went down.

21             MS. LONGOBARDI:  Refilling the soap containers and

22   things like that.

23             If there were days in which it truly rained from 6:00

24   in the morning until midnight, then we can certainly stipulate

25   that you probably didn't have a full crew on washing cars; but

E436JVCC

1    I am not sure that -- well, I don't know so I cannot speculate.

2    But just as a function of which days did it rain in a given

3    month, we can stipulate to that.

4              THE COURT:  Of course that is a start.

5              MR. MAIONE:  Your Honor, that is a start.  Let's take,

6    I believe it is August, September of 2011.  Twenty-three inches

7    of rain in the city of New York.  The two wettest months in the

8    history of New York.  19.3 inches of rain in September alone.

9    Sorry, 18.9.

10             Now, I don't know what Mr. Arenson's experience is,

11   but I don't wash my car an hour or two after it stopped raining

12   especially if I have to pull back out into the street where

13   there is water all over the street.  So how many days did those

14   car washes operate in those two months?  According to

15   Mr. Vasquez not many.  It is similar to the experience we had

16   this past winter.  It snows and you have slush in the street

17   for four or five days.  I am not bringing my car into get

18   washed and pull it back out into the street.  There are a lot

19   of issues concerning whether or not the car washes are open on

20   those days.

21             I visited the car washes personally, your Honor.  They

22   are bare bones.  They are either cinder block walls or aluminum

23   siding on one side and a glass partition.  I cannot believe

24   that it would take more than three guys to wash that down in

25   two hours.  Plus, car washes are wet all the time.  What are

E436JVCC

1     you washing them for again?  They are only going to get soap

2     and water on them again in two minutes.  All of that testimony

3     I think is a little bit over the top.

4                  THE COURT:  There is a panoply of such issues.

5                  MR. MAIONE:  Right.

6                  THE COURT:  The topic we're really concerned about

7     this afternoon is how much of those issues requires input from

8     Mr. Vasquez?

9                  MR. ARENSON:  May I be heard, your Honor?

10                 THE COURT:  Yes.

11                 MR. ARENSON:  Mr. Vasquez at his deposition stated

12    that the managers run his businesses.  He supervises his

13    managers, but that the managers run his businesses.  He doesn't

14    hire people.  He doesn't fire them.  It is the managers who do

15    that.  Any records that are kept, he was very clear and said

16    the following:  Daily lists are kept by the managers of who

17    works there.  They are sent by the managers to a secretary who

18    works in his home.  He referred to her as the secretary of the

19    car washes.

20                 THE COURT:  Mr. Vasquez's.

21                 MR. ARENSON:  Mr. Vasquez's home in New Jersey.  Her

22    name is Millie DeJesus or Millie Jesus.  She then puts those

23    papers together and sends them at the end of the month to the

24    accountant.  He testified he doesn't look at them.  It goes

25    from the managers on site to the secretary in his home to the

E436JVCC

1    accountants.  He is out of the loop.  When asked what he does,

2    he says, I supervise.  He used the words, I review the

3    structure of the car washes.  I review the structure of the car

4    washes.  I am not sure what that means.  I collect the money.

5    He said over and over again, I come to see the car washes are

6    clean and that's about it.  So in terms of the day-to-day

7    interaction with the workers and the issue of whether or not --

8              THE COURT:  What does he mean, I collect the money?

9              MR. ARENSON:  I think at a minimum on a weekly basis

10   there is an amount of cash that is collected.  The income, the

11   money the customers pay is kept in a safe on site and he comes

12   and he collects it.

13             THE COURT:  Physically?

14             MR. ARENSON:  Yes, physically.

15             THE COURT:  He drives around.

16             MR. ARENSON:  That occupies I think a significant

17   amount of his time, collecting the money.  I was go going to

18   say the bags of money, but the money.  That's right.

19             In terms of these workers, whether or not these

20   workers were employed by the car washes, I think there is a

21   more than credible argument to be made that Mr. Vasquez is not

22   the direct source of information despite the fact that he was

23   designated as a corporate designee and gave most of the answers

24   "I don't recall" and "I don't recall"; but by his only

25   testimony, we can provide something to the Court, a letter,

E436JVCC

1    describing it and presenting it to the Court where he may not

2    be that relevant to this issue.

3              THE COURT:  Or to the other issues?

4              MR. ARENSON:  That's right.  That's right.

5              THE COURT:  That's all under the jurisdiction of the

6    managers in your view?

7              MR. ARENSON:  That's right.

8              MR. MAIONE:  Your Honor, I never characterize

9    testimony because I find out that I never remember it unless I

10   read it.  All of the plaintiffs have said he comes to the car

11   wash.  He tells them, Dry that car.  Come over here.  There is

12   conflicting testimony as to how much time he spends at the car

13   washes.  My adversaries argue that he has to sit for seven

14   hours a day for five days because he is the corporate designee

15   of all these four corporations and he has got to testify on his

16   own behalf and now they are making his testimony almost

17   irrelevant.  So you kind of can't have it both ways.

18             The fact of the matter is the managers do oversee the

19   car washes from day-to-day.  There is no question about that.

20   There was a lot of testimony about his going to the car washes.

21   Sometimes as I recall he said he goes on a daily basis.  Other

22   times I think he testified that he goes weekly.  He goes there

23   and he collects money and he collects the information as to how

24   many cars were washed, etc., how much each guy received who

25   ostensibly works there, yeah, he is involved in his car

E436JVCC

1    washes.  So I don't know how all of a sudden they can say he is

2    not relevant.

3            MR. ARENSON:  Our position is based on his testimony,

4    your Honor -- Mr. Vasquez's testimony.  Mr. Maione asked the

5    plaintiffs, Have you ever seen Mr. Vasquez?  They said, Yes.

6            Have you ever spoken to him?

7            They said, Yes.

8            He said, What did he say to you?

9            Dry the car over here.  Hurry up.  Things like that.

10           How many times?

11           A few times.

12           Some of them said it would happen maybe once a month.

13   Those kinds of very brief instructions were said by the

14   plaintiffs only to the extent that they were answering the

15   question, Have you ever seen Mr. Vasquez and have you ever

16   spoken to him.  They have had no conversations with him.

17   Beyond that the conversations with the managers however have

18   been extensive.  The reason why we wanted to depose Mr. Vasquez

19   for all those days was because he and his lawyers designated

20   him as a corporate designee.  We were disappointed to find out

21   that most of his answers were "I don't know" and "I don't

22   recall" and "I will have to check."

23           THE COURT:  Let's shift the topic to his medical

24   condition.  Is there anything new on that?  I have read your

25   letters.

E436JVCC

1          MR. MAIONE:  Your Honor, all I can tell you is from

2     personal observation there are times when it is extremely

3     difficult for me to communicate with him.  I've questioned his

4     ability to communicate a number of times in the last couple of

5     months and made some personal inquiries on my own because I

6     found out that he was bipolar and I know nothing about bipolar

7     disorder and I asked some experts how do these people manifest,

8     and kind of consistent with the way I've had trouble and

9     difficulty interfacing with him.  He has gotten worse over the

10    last couple of months.  And then I got a call out of the blue

11    from his doctor and then subsequently that doctor's note and I

12    can't say anything more about his medical condition because I

13    don't know.  His doctor apparently says that he is not in

14    decent enough shape to participate in the proceedings.  I don't

15    know whether that is true or not.  All I can go is by what I

16    presented to the Court.

17          As I said I have an e-mail from him last night, which

18    was very disjointed which was unusual.  He speaks English.  He

19    doesn't write English like a scholar, but usually I understand

20    what his e-mails are intending to say.  I didn't get that

21    impression from what I saw earlier this morning.  All I know is

22    he told me he hasn't slept in five days.  I imagine that is

23    part of the whole thing from what I understand.  And also from

24    actually speaking to his girlfriend because sometimes when I

25    called, she picks up the phone.  Yesterday I called and she

E436JVCC

1   said, He was up all night until 5:00 in morning walking around

2   and went to sleep and got up at 11:00 and left and I haven't

3   seen him.  He has come in and out, but I haven't seen him.

4           THE COURT:  I have an engagement to be on the bench in

5   half an hour.  So I am going ask everybody, including myself,

6   to err on the side of being laconic.

7           MR. MAIONE:  I think --

8           THE COURT:  I think we'll move away from that.  I take

9   it from what you are saying that you agree that an independent

10  medical examiner is what must be done?

11          MR. MAIONE:  I don't see having a valid objection, no.

12  He has put it into play.

13          THE COURT:  Laconic.  It seems to me obvious.  Have

14  you got anybody in mind?

15          MS. LONGOBARDI:  I do, your Honor, and I brought his

16  information with me for you and for Mr. Maione.

17          THE COURT:  When can you accomplice it?  How soon can

18  you have him ready?

19          MS. LONGOBARDI:  Well, the issue is this:  I have

20  already spoken with Dr. Kleinman and he tells me he needs the

21  medical records.

22          THE COURT:  Excuse me?

23          MS. LONGOBARDI:  He needs Mr. Vasquez's medical

24  records.

25          THE COURT:  See, that is something you did not say in

E436JVCC

1    your letter.  You said that you would like to get them for him

2    and you needed them before the examination, but my reaction to

3    your letter was I will pay much more attention to the request

4    for 15 years' worth of medical records from the examining

5    doctor than I will from the lawyers.

6         MS. LONGOBARDI:  Okay.  I can certainly go back to

7    Dr. Kleinman and ask him if he will make that request to me in

8    writing if you would like me to do that.

9         THE COURT:  Well, does he need them before he examines

10   him?

11        MS. LONGOBARDI:  He does need them before he examines

12   him to know what Mr. Vasquez's history, what his diagnoses have

13   been, what treatments he has gotten in order to then do his

14   evaluation.

15        MR. ARENSON:  There is the risk, your Honor, if Mr.

16   Maione is saying that Mr. Vasquez is not communicating in a

17   clear way to Mr. Maione, there is a risk that even a doctor

18   will not be able to get clear answers and that the medical

19   history as revealed in the records will be the best source.

20        THE COURT:  He hasn't even tried yet.

21        MR. ARENSON:  True.

22        THE COURT:  So we're speculating --

23        MR. ARENSON:  Yes.

24        THE COURT:  -- in the lawyers' desire to fend off any

25   possible problem by gaining every possible record.  It's a

E436JVCC

1    concession of the shortness of life.  We have to get to the

2    point on these things.

3           MS. LONGOBARDI:  Being terse, at a minimum I have to

4    have Dr. Valbrun's records.  He indicates in his letter that he

5    has treated him for the last two years, but he is also the one

6    who has said there have been multiple hospitalizations.

7           THE COURT:  Maybe he has all of those records if they

8    are so necessary to an examining doctor as you say.

9           MS. LONGOBARDI:  I will inquire of Dr. Kleinman.  I

10   will tell him I can get Dr. Valbrun's records as soon as

11   possible and get them to him for the IME.  He may still tell me

12   he is still going to need to know what the other

13   hospitalizations have been.  Now, if they are in Dr. Valbrun's

14   records, that may be all; but if I limit it at this point, I

15   cannot foreclose the possibility that Dr. Kleinman will say, I

16   need everything.  I will ask him.

17          THE COURT:  I don't think I can remember a case in

18   which a lawyer was penalized for proceeding step by step on the

19   basis of evidence rather than in advance on the basis of

20   concepts about the universal availability of records.  I cannot

21   remember.  The one who goes forward step by step with the

22   witnesses who say, Well, I need this and need that, I think

23   they have always gotten it to the extent it is available.  Of

24   course, it is much faster and cheaper.

25          You have a trial coming up.  If I were you, I would

E436JVCC

```
1    take that doctor's deposition as fast as I could.  If I could

2    do it tomorrow, I would do it tomorrow.  If not tomorrow, on

3    Saturday.  And ask him, We understand that you cannot make a

4    diagnosis without getting 15 years' worth of records.  Did you

5    happen to collect 15 years' worth of records before you made

6    your diagnosis?  If so, can I see them?  The whole thing may

7    drop into your lap.  It is easy for me to speculate

8    optimistically.  It is your duty to speculate pessimistically.

9    What we need is facts.

10          Go head with that.  If you need more records, I am

11   here doing business the same stand, one judge, no waiting.

12          MS. LONGOBARDI:  My hesitancy is that in order to do

13   an effective deposition of Dr. Valbrun, I would almost need the

14   IME done first because otherwise he is just telling me what his

15   diagnosis is and why and I can't evaluate that.  I have no

16   psychiatric training.  I would need the IME's report in order

17   to give me the guidance as to what I should be asking

18   Dr. Valbrun.

19          Let me just add this as well:  I did say this in my

20   letter, but I want to put this on record, too, since

21   Mr. Vasquez is the one who put all of this at issue, I think

22   this needs to be done at his expense.

23          THE COURT:  I have no basis for making any such

24   decision at this point.  There are a variety of issues and

25   investigations in any litigation and the costs are usually
```

E436JVCC

```
 1     allocated after the thing is over, not item by item.  We don't
 2     pay for the main course before the dessert is served in this
 3     restaurant.  You get one bill.
 4             MS. LONGOBARDI:  Well, your Honor, in the usual
 5     wage-an-hour case, there is never a need for a psychiatric
 6     examination of the defendant.  This isn't a sexual harassment
 7     case.  It is not a criminal case where those things typically
 8     may come up.  Mr. Vasquez has taken us down this path.  These
 9     are expenses that ordinarily would never have come up in a wage
10     case.  I agree other types of expenses would wait until the end
11     of the case, but these are extraordinary expenses.
12             THE COURT:  That means what about who should bear
13     them?
14             MS. LONGOBARDI:  It means because he has put them in
15     issue.  It is an order that he bears the cost of these.
16     Effectively becomes an administrative claim in the bankruptcy
17     proceeding.
18             MR. MAIONE:  Your Honor, I may?
19             THE COURT:  No.  Let me think for a moment.  They
20     become administrative costs in the bankruptcy case.  Well, I
21     think you are leapfrogging to a conclusion that may well be
22     correct but not necessarily.  I think I would rather proceed in
23     the normal pedestrian way that I do the best I can with costs
24     in this litigation and the way they are handled in the
25     bankruptcy proceeding is after they have been incurred here.
```

E436JVCC

1    Then their treatment will be determined rather than to have me

2    adjusting what costs are incurred in an effort to maximize the

3    recovery in the bankruptcy.  I just think it is better

4    administration.

5         MR. ARENSON:  The elephant in the room from my

6    perspective, your Honor, is that if we review the first notice

7    of deposition, Mr. Vasquez's lawyer was fired.  If you review

8    the second notice of deposition, he filed for bankruptcy.  Then

9    he came to the deposition and said, I will not answer

10   questions.  Then he said, Okay, I will answer questions, and

11   did not show up.  Then after that he said -- we got the

12   Dr. Valbrun letter.  I have with all due respect to everyone in

13   this room, and casting no aspersions obviously on Mr. Maione

14   who we all respect and like, this doesn't seem kosher.  So

15   therefore, we feel that this 11th hour letter from Mr. Valbrun

16   after Mr. Vasquez was there at every plaintiff's deposition,

17   was there for things that served his interest is now suspect in

18   our view.  That is part of the what animates our request for

19   the expenses to be borne by him.

20        THE COURT:  Well, I will follow the old-fashioned,

21   timeworn response:  Costs will be allocated at the end of the

22   procedure and will depend a good deal on the outcome.

23        MR. ARENSON:  Understood, your Honor.

24        THE COURT:  Well, in short it seems to me that the way

25   we're disposing of the eight items suggested by

E436JVCC

1   Ms. Longobardi's April 1 letter is that the need for Items 1

2   through 3 is deferred until the experience shows they are

3   necessary and that professional opinions require them; that

4   Items 4 and 5 are conceded to be the path we should proceed

5   along with some reservation in my own mind about the sequence

6   whether it is essential to the IME report to have the study of

7   the report to go first or whether Dr. Valbrun should go first.

8   I think I will leave that to counsel at the moment.  Then the

9   in terrorem clauses that follow are disregarded as being

10  inherent in the process.

11          MS. LONGOBARDI:  I just would like one thing

12  clarified, your Honor.

13          THE COURT:  Sure.

14          MS. LONGOBARDI:  Can I at least get conceded,

15  stipulated, something, that I can get Dr. Valbrun's records

16  immediately?

17          MR. MAIONE:  To the extent that I --

18          MS. LONGOBARDI:  I will give you an authorization for

19  him to sign.

20          MR. MAIONE:  Sure.  Other than that one time, your

21  Honor, I have never spoken to the doctor.

22          THE COURT:  You have the letter.

23          MR. MAIONE:  I will do that.

24          THE COURT:  When he writes the letter, he must be

25  aware that for HIPPA purposes the tail goes with the hide.

E436JVCC

1          MR. MAIONE:  Yes.

2          THE COURT:  I would start there.  You know much more

3     about the case.

4          MR. ARENSON:  We had wanted Mr. Vasquez to sign HIPPA

5     authorizations enabling us to get his records and we wanted to

6     do that now so we can send those authorizations out as quickly

7     as possible.  When you said that we're deferring One through 3

8     may, we go forward with getting authorizations?

9          THE COURT:  Absolutely.  If you can find him and get

10    him to sign something, I think it is a great step forward.

11    Photograph him, fingerprint him, or anything else.

12          It has been remarkable how every deposition taken by

13    Mr. Vasquez, whether inflicted by force measure or act of God,

14    has all been to his advantage in his litigating costs.  Some

15    people are just lucky.

16          Thanks for coming in.

17          MS. LONGOBARDI:  Thank you, your Honor.

18          MR. MAIONE:  Thank you, your Honor.

19          MR. ARENSON:  Thank you, your Honor.

20                              o0o

21

22

23

24

25